Coalter, Judge.
In the year 1756, William Byrd, being about to leave this colony, and being much in debt, for the purpose of providing a fund to maintain himself and family, and to pay his debts, conveyed to Peter Randolph, John Robinson, John Page, Presley Thornton, Charles Carter, Peyton Randolph and Charles Turnbull all his plantations, lends and tenements, lying in the counties of Chesterfield, Henrico, Lunenburg, and Halifax; together with negroes, stock. &c. to receive the profits, or to sell, mortgage, or otherwise dispose of the said property, for the purposes aforesaid. The trustees, by virtue of the power thus vested in them, did, in the absence of said Byrd, sell considerable portions of this property, as appears by the recital in another deed hereafter mentioned.
On the return of said Byrd to this country, to wit, sometime prior to June 1768, but how long does not appear, it was deemed advisable to sell a part of this property by way of lottery; and a scheme was published, signed by William Byrd, which is designated, «< a scheme for disposing by way of lottery, of the lands and tenements under-mentioned, being, the entire towns of Rocky Ridge, now Manchester, andShockóe, now a part of Richmond; lying at the falls of James River, and the lands thereto adjoining.” By this scheme a great many improved lots and tenements on both sides of the river, *108 are designated as large prizes, many of them very valuable; together with 10,000 acres of unimproved land, laid oif, in lots of 100 acres each, as also sundry valuable islands, fisheries, &c. The other prizes were half acre lots estimated at 251. each.—-The whole property being estimated at 56,796k The number of prizes were 8S9, and of blanks 9161, making 10,000 tickets. The price of the tickets does not appear. The scheme says, the lottery will be drawn in June 1768, under the management and direction of Presley Thornton, Peyton Randolph, John Page, Charles Carter, and Charles Turnbull, trustees for the same, who will execute conveyances for the prizes drawm by the fortunate adventurers in the lottery. Tickets to he liad of the trustees, also of Col. Arch’d. Cary, John Way les, and the subscriber. The lottery was drawn in November 1768.
After the drawing of this lottery, to wit, on the 4th of May 1770, a deed was executed by William Byrd, John Page, Peyton Randolph, Charles Carter, and Charles Turnbull, surviving trustees of the one part; and Edmund Pendleton, and Peter Lyons, surviving administrators of John Robinson, of the other, whereby the former, after reciting the above deed, and that the trustees did in consequence of said trust, and in the absence of said Byrd, receive the rents and profits of his estate, and did apply the same towards the discharging of his debts, but finding that the debts could not be paid thereby, they sold considerable parts of bis lands, slaves, and stock lying in Halifax, Chesterfield, and Henrico, and in order to save the residue of his estate, did advance considerable sums, and entered into large suretyships, &c.; and particularly, that the said John Robinson did advance several sums of money, which remained due, at his death, to the amount of §20,000 or thereabouts; of which his administrators demand payment, and that the residue of said Byrd’s estate should be sold to raise it, they,, the said first named parties conveyed to said Pendleton and *109 Lyons all that tract of land on James River, near the falls, in Chesterfield, containing acres, more or less, and all the other lands, tenements, lots and messuages lying in the said county of Chesterfield, and in the county of Henrico, belonging to said Byrd, or to the said trustees, and all other the lands, slaves, &c. comprised in the said deed of trust, not before sold by the trustees, or cither of them, and which they have now a right, by virtue of said deed, to sell and convey, except the several prizes drawn by the fortunate adventurers in the said William Byrd’s lottery.—In trust to be sold, &c. if the money shall not be paid on or before the 10th day of December next following, and if paid, the estate to be re-vested in the trustees in the same manner as if this deed had not been made, &c.
It was proved, that the property conveyed in the above-mentioned scheme was a part of the property conveyed to the trustees, in the first deed above-mentioned, and that the ticket 1963, in that lottery, drew the lot 547, which is the subject of controvery, and is described in the declaration as lying on Shockoe Hill. It was also proved, that the said ticket was delivered to John Page, one of Byrd’s trustees, together with a number of other tickets, being a quire of tickets from 1729 to 2004 (amounting to 275 tickets,) as were other quires of tickets to others of his said trustees, but whether the said ticket was over sold by the said Page to any other person, or returned to the said Byrd or to his trustees, did not appear by any direct testimony. It was likewise in proof, that a number of lots in the town of Richmond, on the eastern side of Shockoe Creek in Henrico, which had been conveyed by Byrd to his trustees by the deed of 1756, were not included in the lottery, and were still held by the trustees at the time of drawing the lottery, and of the execution of the deed to Pendleton and Lyons.
Whereupon the court, upon motion of the defendant, instructed the jury, “That even if the said ticket No. *110 1S6S was returned unsold, and held by the said Byrd or his trustees at the time of drawing the lottery aforesaid, yet that the prize which was drawn to its number, by whomsoever the ticket was held, and whether sold or not, was not conveyed by the said deed to Pendleton and Lyons, administrators of Robinson, being expressly excepted out of said deed to them, by the clause of that deed, which excepts prizes drawn by fortunate adventurers in the said lottery.” The question now before us is whether this instruction be correct.
Its propriety is maintained on various grounds. First, It is said to be a legal presumption from which the- court itself can and must infer the fact, that all the tickets were sold, and consequently that the court had a right to instruct the Jury, that whatever might be their opinion as to that fact on the evidence before them, yet the legal conclusion being, that all the tickets were sold, and consequently that every prize was drawn by some fortunate adventurer, no part of the land embraced in the scheme passed; in other words, that such I< gal consequence is paramount to any proof of the actual state of the fact which the plaintiff might offer, and that the court have the exclusive right to infer the fact, and by its instruction as to the law arising therefrom, withdraw the fact as well as the law from the Jury.
Second, And which seems to me to be the real opinion of the court; that even if the Jury had a right to decide on that fact, and might be satisfied that the ticket had never been sold, but had been returned and was held by the trustees at the time of the drawing of the lottery, yet, that fact, however settled was unimportant, because the trustees, for the benefit of the trust fund, having an interest in the tickets thus returned, so far as prizes should be drawn by such ticket, are to be considered as fortunate adventurers within the true meaning of the exception.
Thirdly, It was contended, that they are to be considered as fortunate -adventurers, because the object ef *111 the lottery being to pay debts, the creditors had a right to charge ttie trustees with the aggregate price of all the tickets—i. e. with 50,000k If the price of the tickets was 5l. each, and that they were compelled, by the scheme, to take all unsold tickets on their own account as they were to draw the lottery on a given day, and to pay over the amount to Byrd and his creditors; and that, being purchasers, they were consequently fortunate adventurers, having a right, individually, and not for the benefit of the trust fund, to the lots drawn by tickets riot sold to others. That this is also a conclusion of law, which the court bad a right to draw, so as to apply the exception to all the lands covered by the scheme.
Fourthly, It was contended, that the lottery lots, if they might be so called, were intended to be excluded entirely by the exception, as the grantees did not intend to involve themselves in controversies with ticket holders, and that the terms in the deed “ and all the other lands, tenements, lots and messuages lying in said county of Chesterfield, and in the county of Henrico,” &c. must be construed as to this word, lots, to mean the lots on the eastern side of Shockoe; and that therefore no other lots passed or were iutended to pass by the deed; and that the words “ except the several prizes drawn by the fortunate adventurers in the said William Byrd’s lottery” were intended to exclude entirely all the lots and lands comprised in the scheme of the lottery, notwithstanding the grantors then held for the benefit of the trust fund, lots and lands of that description, undrawn by purchasers of tickets, and which they might have sold and conveyed, had such been the intention of the deed. That as this too, arising from the construction of the deed, is to be settled by the court, it was right to instruct the Jury, that, whatever may be the fact as to the sale of the ticket, yet by the deed no part of the prize property passed.
As to the first of these propositions no authority has been adduced to shew, that the fact to the contrary not *112 withstanding, the law has settled it, that no lottery can he drawn until all the tickets are sold. I believe the general practice will shew that even when the managers fix their own time for drawing, they invariably begin that operation before all the tickets are sold. But if the law be as is contended in such cases, it would not be so, if by the scheme itself, it was to be drawn on a given day, sold, or unsold—this scheme however, fixes the day. Robinson’s estate may have been embarrassed, and his administrators pressing, and whether this was so or not, was a matter of evidence. A deed made about 18 months after, states that they had been pressing: and they probably were unwilling to assent to an indefinite postponement of a sale,
Purchasers of tickets, under the scheme, had a right to have it drawn, whether all the tickets were sold or not,- so that in fact it may have been a scheme to draw, sold or unsold, and this of itself would repel the presumption contended for. But whether the ticket was sold or not, was an important fact in the cause, and if this presumption could at most be only prima facie, then the evidence on this point ought to have been left to the jury, and the court ought not to have proceeded as is supposed, under this head of inquiry, on the assumption of the fact.
As to the second proposition, and which I have no doubt was the real ground of the opinion of the court, if the words “fortunate adventurers,” in the deed, intended to exclude as well lots drawn by purchasers of tickets, as lots covered by tickets not sold, it amounts to an exclusion of all the lottery property. But this might leave nothing for the deed to operate upon, but the lots in Richmond on the eastern side of Shockoe Creek. It does not appear, nor can it well be presumed, that, after talcing out the 400 half acre lots in Henrico, on Shockoe, the 17 improved lots, perhaps consisting each of many acres, and the 10,000 acres to belaid off into 100 *113 acre lots, making, in Henrico, exclusive of Islands, &c. perhaps 10,300 acres, and the forge with two thousand acres in the county of Chesterfield, with 12 improved and 300 half acre lots, amounting, together, perhaps to 2200 acres, and making an aggregate on both sides of the river of 12,500 acres or thereabouts, that he had other lots in either of those counties, except the Richmond lots aforesaid. This however was a matter of fact and may have been in proof, and if it should appear that nothing else was, left for the deed to operate on, then a construction which would render nugatory a whole conveying clause, in the deed above recited, except so far as it conveyed the lots in Richmond, surely could not be maintained. But if there was other property for it to operate upon, and all this was for the jury and not for the court, and we know not what the evidence was, still it is not pretended that there were other lots in Chesterfield than those embraced in the scheme; but the deed conveys lots in Chesterfield and Henrico, and it also conveys every thing else that the trustees' had a right to convey, and if they could convey lots not covered by purchased tickets, and to which of course no one but themselves had a right, then a construction which would go to defeat such express words in a deed, is equally unsound. For if they hold these lots, as is supposed by the proposition under consideration, for the use of the trust fund, and the creditors, they had not only a right, but would be compelled to sell it for the payment of the debts, if necessary. The deed admits that this necessity existed, and purports to be a sale for payment of debts; liow that exception can he construed to exclude more than what they had not a right to sell; how the obvious and natural meaning of the words “fortunate adventurers,” can be interpreted to mean as well those who were selling, by way of lottery, as those who adventured their money in purchase of tickets, and that such construction is so imperatively forced upon us, that the manifest *114 intention of the conveying clause, which was to pass whatever the party had a right to sell, must be defeated thereby, I confess I cannot see.
Thirdly. An argument surely cannot he required to prove that the manager of a lottery, or any other person superintending a sale 0/ property for the payment of debts, is obliged to take at a given price, all the property he cannot sell, and account for the money; and especially if the party procuring his agency agrees, that the lottery shall be drawn whether sold or not, which would exclude, the idea that he becomes the purchaser of the whole, if no tickets are sold, or if the residue be unsold; for if this would not be the correct understanding in such case, the scheme of the lottery itself at once amounts to a sale to the managers of it, at the exorbitant price at which property in such case is generally set down. The third proposition, therefore, will not justify the instruction.
And the fourth I think is equally unavailing to that purpose. This proposition involves a construction of the deed as to the intention of the parties. Why should the party whose duty and object it was to raise promptly a large sum of money due to his intestate, and who then by the first deed, had a lien on all lots and lands not drawn by purchasers of tickets, wisli to exclude this, perhaps the most available fund, from the deed to them? and how can such intention be inferred, from the express words of the deed, by which the grantors convey every thing they have a right to convey? The very statement of the proposition carries on its face, as it seems .to me, its own refutation.
But it may be said, that although the particular instruction of the court cannot be supported, yet, as the plaintiff in ejectment must shew a good title in himself, and having failed therein, the judgment against him is correct, and must be affirmed, although the ground or reasons for that judgment in the court below, are erroneous. Let me ask though, how and in what respect has *115 the plaintiff failed to shew a title? The legal title to this lot must be somewhere; for if not it would be escheatable as has been contended.
It was originally in William Byrd, as is admitted on all hands. Itp. ssed from him to the trustees under the first deed. If it did not pass out of them to Pendleton and Lyons by the deed of 1770, it is yet in them, or the survh or or the heirs of the survivor. The scheme of the lottery did not divest their title, nor did the drawing of the lottery; but if any one purchased from them the ticket that drew this lot, that person acquired thereby a right to a conveyance from them; and there is an exception in the deed covering such right, which excludes from the operation of the general words of the conveying clause, this lot, so as to reserve in the grantors, the legal title for the benefit of this purchaser, who, under the scheme, was promised a title from them. But if no such equity exist in a purchaser; if the trustees, in that case, held this property for the payment of debts, were compellable to it for that purpose, and did sell it for that purpose, then the title- passed by the deed of 1770.
But the plaintiff has not proved, that the ticket was not sold, and therefore he has not proved his title. In the first place, admitting for the present, that the plaintiff must prove, this negative fact, how does it appear that he did not. There was evidence to this fact before the jury, of what nature, by whom produced, or whether by both parties does not appear. The court cut up any evidence that was before them, and forestalled any that might be adduced, by stating, that be the fact as it may, no title passed. Suppose the jury, on the evidence before them, had found the fact, that this ticket had not been sold, but had been returned to, and was held by the trustees at the time of the lottery, but that under the instruction of the court, they found for the defendant; we Could not support the judgment solely on the principle *116 ^ am noW “bating. If we could not, let me again ask upon principle, can we now say that the jury would, or ought to have found one way or the other, had the case been left open? Much less how can we ourselves establish the fact one way or the other? But I deny that the plaintiff either before the jury or here, must prove this negative. It is true, if we have doubts, he must satisfy us that the. law does not conclude this fact against him; but as apure matter of fact, we cannot examine into it, unless on a demurrer to evidence, which does not exist in the case. Before the jury, he is not bound to prove the negative because he cannot, and to oblige him to do that, would be to declare the deed of 1770 void; not because the title ivas not in the grantors, but because portions of this land having been sold but not conveyed, it has now become legally impossible to sell the residue of this fund for the payment of debts. A court of Equity cannot decree, because, though that court can make many parties, it must make all the world parties, and some person may have purchased; the person therefore who has got possession resists both trustees. He resists the old trustees, because if they have sold, and admit that to be the fact, they cannot recover as the party would contend, when there is a complete outstanding equity against them. They have sold and received payment, and whether a conveyance be asked of them or not, is nothing to them; it is a trust satisfied as to them, and they have only to convey when requested. If they say they have not sold the ticket, and that therefore there is no equity of that kind, they were at once opposed by the deed of 1770, which, if the property be thus situated, passed the title. But when the trustees under the deed of 1770 sue, they must prove the negative, which being impossible, their defeat follows. If this be law, then perhaps it will follow, as has been argued, that this property must escheat, although the title is certainly in one or the other set of trustees. But all this con *117 fusion and difficulty is at once put to rest, by tbe sound doctrines of the common law; that a negative need not be proved, hut that he who insists on the benefit of a positive averment, as here, that this ticket was sold, or who seeks to protect himself by an exception in his favour, must prove the affirmative, and bring himself within the exception. Perhaps this party would have succeeded in his efforts to do so before the jury, though we might be induced to doubt it, from his resort to the instruction asked of the court.
Bat if he really have no pretension of this kind, but seeks to hold property to which he has no just claim whatever, on the ground that some other person may have an equitable claim to it; and that he by holding possession long enough, may defeat every body, I think such pretension ought not be sanctioned here, if the present plaintiffs recover, they will hold the title for any having the equity, which it is hardly to he presumed at this late day is outstanding; and if none such, for the other cestui que trusts, who must be greater favorites in a court of justice, than claimants resting on the above principles.
On the whole I am for reversing the judgment. But this court being divided it must be affirmed, and this suit, though not the law of the case, settled.*
Roane, Judge.
This is an action of ejectment, brought by the appellants as heirs of i‘. Lyons, tbe surviving trustee of Pendleton and Lyons, under a deed of trust of 4th May 1770, executed to them by the trustees of W. Byrd, under a deed of 18th September 1756. It claims against the appellee, a lot numbered in the plan of the city of Richmond 547. A verdict and judgment was rendered for the defendant, on which the plaintiffs appealed to this court. The verdict was rendered under an instruction *118 of the superior court, which will presently foe more particularly noticed.
If the appellants, the heirs of Lyons, have not a complete title to the premises, they ought not to recover in this action. They ought not to recover, although Bird’s trustees, from whom they claim, should be shewn to have such title, and the appellee should also he shewn to have none. Possession in him is a good title, in .this action against any plaintiff except the true owner. This is the, established doctrine on this subject. It is emphatically laid down by the court of King’s bench in England, in the case of Haldane, v. Harvey, (a.)
The present appellants may not have such a title, for want of adequate words in their deed to convey it, or for want of a right to the subject, in those under whom they claim. On both these grounds, the title of the appellants appears to me to be defective. The first defect is alone sufficient; but I will also consider, whether the trustees of Byrd themselves had a title, which could have passed by the deed of 4th May 1770, had its terms been more comprehensive.
Those trustees it is admitted, had the legal right to the land in question, under the deed of 18th Sept. 1756. This land with a great deal of other land was conveyed to them by Byrd, to be disposed of for his benefit. By the scheme of a lottery referred to in, and made a part of the bill of exceptions, they offered this lot for sale, together with a great many other improved and unimproved lots, and other valuable property, it was the object of the scheme to dispose, of all the land therein mentioned by way of lottery, and not a part only of that land. The object of the lottery was, to use the words of the scheme, to dispose of 6i the land” therein mentioned; that is, of all the said land, and not merely a part thereof. Again, the scheme purports, to dispose, of the entire towns” of Richmond and Manchester; and not the *119 said towns, in exclusion of the lot in question, and other lots under like circumstances. The construction contended for by the appellants, excludes the lot in question, and departs from the said scheme; whereas, that contended for by the appellee, includes the said lot, and conforms to the scheme aforesaid. The facts proved in the cause, as stated in the bill of exceptions, entirely accord with the construction last mentioned. It was proved, as the exception states, that the lottery was drawn “in conformity to the terms of the said.scheme;” and therefore, as the said scheme extended to the whole land, and lots, it was proved, th at it was drawn as to the whole land, including this lot also. Again, it was proved more particularly, that the ticket No. 1963 s¡ drew the lot” now in question. This fact is utterly inconsistent with the idea, that the ticket by which this lot was drawn, was not disposed of, in the lottery aforesaid. It is considered under this finding, as having been so disposed of, even if it were retained by Byrd himself, or his trustees aforesaid. These positive, and unequivocal findings, are not at all impugned by the farther statements, that the ticket 1963 was delivered to John Pago, one of Byrd’s trustees, together with a number of others; and that it did not appear by any direct testimony, whether the said ticket was sold by Page, to any other person, or that it was returned to the said Byrd or his trustees. In this uncertainty, we ought perhaps to consider Page as the owner of the ticket, in whose hands it is last shewn to have been, and who undoubtedly had a right to retain it, or sell it to himself.(b) This statement is entirely consistent with the idea of a sale to Page himself, to Byrd, or to the trustees themselves, by means of the election to bo presently noticed, and which would constitute him or them adventurers in the lottery. This conclusion *120 must be drawn from the facts found, and from circumstances, notwithstanding it did not appear from any direct testimony, that the ticket was sold to others. Notwithstanding this defect of proof, it might well be infer - red, that the ticket was sold to, or retained by, one or other of the parties aforesaid.
The instruction of the superior court is entirely borne out, by the facts proved in the cause. Those facts could not have been found, unless the ticket in question had been disposed of, by being sold to others, or retained by the parties themselves. Both the judgment, and the proofs on which it rests, repel the idea, that the lottery was only drawn in part; that it was not drawn as to the ticket in question. It has been said, that such an inference arises from its being stated in the scheme, that the lottery was to be drawn in June 1768, whether as is alleged, the tickets were all sold or not; this last inference is not warranted by any tiling contained in the scheme; on the contrary, as it is proved in the cause, that the drawing did not take place ’till November 1768, I would make an inference entirely opposite. I would rather infer, that the delay took place to give time to sell those tickets; and that within that time, they were all sold.(c)
By the scheme found in the case, tickets were tobe had also from Cary and Wayles, who were not trustees. If Cary and Wayles did also receive tickets, which they did not sell to others, nor return to the trustees, before the drawing, but stood by, and saw the lottery drawn, *121 would it not be held, that they liad elected to purchase those tickets themselves. A contrary construction is not only reprobated by the finding, that the lottery was drawn in conformity to the scheme, as aforesaid, which scheme purports to sell all the tickets, but also might have been highly iniquitous as to Byrd. His object was to sell his own property, for a certain sum; but this construction would deprive him of a part of the purchase money, when his whole property might nevertheless have been swept away by the fortunate tickets of others. There is no reason why all or any of these, individuals might not sell tickets to themselves. It very often happens that the person instituting a lottery, is himself an adventurer in it (d) He may not otherwise be able to effectuate the object intended. He maybe the vendee as well as the vendor of a lottery ticket. In this case as well as in others, the maxim applies, that when two rights concur in tlie same person, they are to be considered, as if they were in different persons.
If Byrd’s trustees bad a title to this lot therefore, instead of Page, who is shewn to have been the last possessor of the ticket which drew it, it was only by virtue of the drawing. It is not shewn in this case, that they drew the lot in question; but if they did, their title, thereto did not pass to Pendleton and Lyons by the deed of 4th May 1770. That deed only conveyed such property as had not been, before sold by them, and which they had at that time, a right to sell—not by virtue of their success in the lottery, “but by virtue of the deed of 1756.” Their right under that deed had been extinguished by the lottery, even if the trustees, themselves, drew the lot in question; and therefore it did not pass, because it had been, “before sold,” by means of the lot *122 tcry; and because it was not property, which they had a right to sell, under, and by virtue of the deed of 1756.” There is nothing in the exception in the deed, respecting prizes drawn by the fortunate adventurers in the lottery, which can vary the construction. It is at most a mere pleonasm; and it applies to Byrd and his trustees as much as others, if the principles I have stated be correct. Even if they drew this lot, in the lottery aforesaid, this exception expressly withholds this property from the operation of the deed of 4tli May 1770. Nor is that construction at all affected by the insertion of the term “lots,” in the conveying part of that deed. It is expressly proved, that there were other lots, not comprehended in the lottery to satisfy this call in the deed.
This construction of the deed of 4th May 1770 was explicitly recognised by this court in the case of Mayo v. Murchie.(e) It was adopted by me for the same reasons substantially, which arc now assigned. One of the other Judges now present, also admitted in that case, that if the land then in controversy, had been a “ prize drawn” in the lottery, (as the lot in question is explicitly proved to have been) it would not have passed to Pendleton and Lyons, as he supposed it did; in which last idea however, he was overruled by the other Judges. It seems clear therefore, both upon the authority of that case, and upon principle, that this lot, even if the title thereto were shewn to have been in Byrd’s trustees, under the lottery, did not pass by the deed of 4th May 1770.
As for the legal title which is assei’ted to be in Byrd’s trustees, under the deed of 1776, and in consequence of their not having made a deed for the lot to the holder of the ticket, it will be time enough to discuss that point, when those trustees shall become parties. As however, ■% naked legal title would not probably prevail in their *123 favor against the cestui que trust,(b) it would probably not prevail against the present appellee, even if those trustees were now plaintiffs. It would probably not prevail, because they would not be considered as the true owners. It would be wrong to oust the appellee of his possession, in favor of a plaintiff, who, notwithstanding this naked legal title, could not recover against the holder of the ticket, and must yield up the land to him. The possession of the appellee is only to be yielded up to the true owner. On this point however, I only give my present impressions: it is not now essential to the decision of the cause. 1 am for these reasons of opinion to affirm the judgment.*

 See the note to the case of Taylor v. Bruce, p. 73. Reporter.

) 4 Burr 2487.

 I have understood, that Page’s representatives are now suing for this, and other lots, oji this ground. Note by S. R.

 In the record in the case of Southall v. M'Keand, 1 Wash. 336, now before me, is an exhibit which states in full all the fortunate numbers in Byrd’s lottery. In that exhibit the ticket 1963 (now in question) is stated to have drawn the lot 547, which is also now in question. And in Wythe’s Reports 126, it is said by the Judge, that “ after the lottery was drawn, the Managers for the information of purchasers published in print the list aforesaid. ” Are we wiser than those Managers? And are we not estopped to say, that the lottery as to this ticket, was not drawn? Note by S. R.

 It is proved in the before mentioned case of Southall v M!Keand, that Col Byrd was such an adventurer; and, that he drew in the said lottery a valuable lot called Byrd’s warehouse. JYote by iS. JR.

 Munf. 358.

 Note, Judge Bhooki; concurred with Roane; and Cabéis With CqaJiTTsh without giving opinions. Reporter.

) Cowp. Rep. 46. Hart v. Knott.